Call the next case please. Case number 090768, Amy Moore v. The People for the Ethical Treatment of Animals. Please identify yourselves, Counsel. Good morning, Your Honors. Rick Schoenfield on behalf of the Plaintiffs' Appellees. Good morning, Your Honor. Mark Boyle on behalf of the Plaintiffs' Appellees. Your name again? Mark Boyle v. O'Leary, and I represent Diana Presnick and John Keene. Jim Best, and I represent Mary DePauw. She's with the Plaintiffs' Appellees also. All right. We'll give you 15 minutes per party. And I'll, or we will, later address the issue of the motion that was filed either this morning or last night, but it will not necessarily be discussed here. Okay? I'm not aware of the motion. Doggy do right versus blah, blah, blah for sanctions. It was filed by us. Arising solely on Maria DePaulo's motion for a frivolous lawsuit. As to counts, I think it was 6-7 or 7-8. All right. Save your time for rebuttal if you have it. Yes, Your Honor. Okay. May it please the Court? It may. Again, Rick Schoenfeld on behalf of the Plaintiffs' Appellants. Article I, Section 4 of the Illinois Constitution provides that all persons may speak, write, and publish freely being responsible for the abuse of that liberty. In this case, the three defendants abused that liberty by making multiple false statements, which defamed the plaintiffs and held them falsely. Where are they false? Let's start with that. Give me a specific indication of somebody saying something specifically false. Defendants O'Presnick and DePaulo said that... And be careful what you say about DePaulo in light of the motion, because my next question will be to you, where did DePaulo ever say anything specific? Where did she say it and to whom did she say it? I just put that in perspective because that's what this is going to address you. So I would suggest you think about that. Ms. O'Presnick said that there was an electronic collar strapped around a dog's genitals. So? Isn't that an opinion? No, that's an eyewitness claim of a matter of fact. Well, you know, you repeat that later on. Is it false? Yes, it is false. Opinions includes eyewitness testimony. That's long been the rule in criminal cases that an identification made by a witness is not a fact. It's an opinion. It's an opinion of that witness. I believe that this person did this, this person did that. It doesn't mean that that's a fact. It is strictly that witness's opinion. This is not a matter of identification, Your Honor. It's identifying something around an area of the dog, either the buttocks or the collar or what, the genitals, whatever you say she said. That's what she viewed it as. If I was to say that someone struck their spouse on the head, and if that was false, that would be defamatory. Here, it is not a matter of opinion. It is a matter of fact of whether the collar was strapped around the dog's genitals. In fact, the dog was a female dog, which would make such a thing completely impossible to do. And even if we were to view this as an opinion, the law of defamation is that statements of opinion can be defamatory when they're given with a factual basis. That's where the verifiably false test comes into play. Here, it is certainly given with a factual basis. I saw it was strapped around the dog's genitals. She said, and in the context of, it was so disturbing, her phrase, it was so disturbing. This is clearly a context in which she's saying this was a very bad thing. Isn't that an opinion? It was so disturbing? Disturbing may be an opinion. She wasn't, we didn't say the defamatory statement was, it was disturbing. I'm saying that that placed the false defamatory statement in context. And we interpret whether something is defamatory in part by looking at the context. Now, as to Mr. Keene, he wrote on the internet that Amy Moore, on multiple occasions, committed the crime of animal cruelty. Because what he said was that people had to witness continued acts of animal cruelty. So he's saying she committed multiple acts of animal cruelty. And obviously if they were continued acts, plural, there had to have been a prior act that he was saying she committed. He did not say, and those were his words. And this was not describing how somebody was reacting to it or what somebody thought about it. We didn't sue him for making the arrest. We didn't sue him for his statement that he thought there was probable cause. We sued him for saying that she didn't. And that's crossing the line. Now, as to Ms. O'President, what we alleged was that on information and belief, which the proper way to plead. That not according to the case law that's been cited by your opponent. And it doesn't really make it very specific. At least as to the one, the statutorily one-year DePaulo one, it doesn't get you in. It leaves you out. They're not reading the complaint properly, I believe. The complaint, first amendment complaint, this is when we named Ms. DePaulo, said that PETA had posted and was continuing to post these things on its website. That's PETA. But the allegation. PETA is gone. Yes, Your Honor, but let me explain how it fits together for a minute. We didn't say. So on or about is not a phrase to use in connection with when PETA is doing the posting. We allege PETA was posting these statements up to and including the time that we filed against Ms. DePaulo. That's where the statute of limitations comes in. So it's clearly alleged that these statements are made within one year. What we were alleging was that PETA had published statements made by Ms. DePaulo. What we said was that on information relief, we believe that Ms. DePaulo had made these statements to PETA about the electronic collar being strapped around the dog's genitals. And a person is liable for defamatory statements which are republished by others. At least if made with anticipation that they may be restated. Now, please remember that this is just on pleadings motions. We didn't get into this. This is not a trial. I have a motion for summary judgment. There's no discovery involved here. This is simply pleading. Isn't your position contrary to the Uniform Single Publication Act? No, Your Honor. By your analysis, if something was put into a book or an article, every time somebody picked that up and read it, the statute would start anew. No, Your Honor. For this reason. Continuing to publish on the Internet, at least on a website where changes are made, so it doesn't continue to be identical, that is akin to publishing a different edition of a newspaper or a different edition of a book or rebroadcasting a television or radio show. And all of those things that I just listed are republications which create a new cause of action. I will agree, and I said in the brief, the issue is whether this type of Internet situation, which is not addressed by the statute, is more akin to the examples Your Honor asked me about, put a book out there, or more akin to the examples I just listed, rebroadcast a television show. The law on all those things is clear. This is a case of first impression in Illinois as far as how to apply this to an Internet situation with a website which is changed from time to time. And I think that not only are we dealing with electronic media here, such as the rebroadcast of a television or radio program, where they don't have to change the program. They just send it out again. The rationale behind that being that more people will hear it or see it. Well, here, more people will read this on the Internet when they go to the website and they go to this portion of the website. Because if you already read it, probably aren't going to go back and read it again. They didn't delete it because they want more people to see it. Is that still a single publication? It's initially done. Yes. Just because I read something a month later doesn't mean it's a new publication. When a television show is rebroadcast, that's a new publication. That's not the issue here. Correct, but the issue is what is this more akin to? I think it's more akin to a newspaper. Well, then I have an uphill battle, I guess, Your Honor. I think it's not, and here's another reason why. Because once the newspaper is out, it's out. You can't get it back. Whoever picks it up, picks it up and reads it. Here, what's posted on the Internet can be taken down. So that's a substantial difference between the newspaper or the book that's put out there and you can't get it back and you can't control it anymore. It does make it more like the second edition of the newspaper where you can edit it out or like the rebroadcast of the radio show where you don't have to send it out again. You've got control over whether this continues to be out in the public domain or not. Let's go back a minute to your original statement dealing with the falsity of what was reported. You have your observations by several lay people and a police officer. They report what they saw, and what they observed and what they saw, it seems to me, is pretty consistent with your client's self-described training techniques that she uses positive and negative reinforcement. She straps the electronic collar on these dogs. She shocks them when they don't do what she wants them to do. Isn't that part of her training technique? So what is so unusual about people seeing that and reporting simply what they observed, which is consistent with what she admits she does? First of all, they weren't really admissions. They're drawing certain statements from the newspaper article, which we were required to attach to show what they said. Isn't it part of her training regimen to do exactly what these people are saying she did? No, because it is absolutely not part of her training regimen to put an electronic collar and send electric shocks to a dog's genitals. That's utterly not true. What if the collar is around the hindquarter of the dog? There's two collars we're talking about, one around the neck and one around the hindquarter. Some say it's the genitals, near the genitals, around the genitals. But isn't this part of her training regimen? She walks the dogs around the park, and she shocks them when they don't behave the way she wants them to behave. No, no, because the record does not say she shocks the dogs. First of all, we're not talking about anything. What's the purpose of the electronic collar then? An electronic collar can give off a beeping sound. An electronic collar can give off vibrations. Shocking a dog so that it's lifted off of the ground, such as Ms. O'Presnick claimed, is an entirely different matter. You're saying that's unusual? Is that unusual? Yes. Then my neighbor's in trouble. Your neighbor? He's got that electronic fence. He's got it maxed out, so that dog even comes near it. He's taken about ten steps through the air, going the other way. People use electronic fences. There's a fundamental difference between that and putting something on a dog's genitals. Just as there's a fundamental difference between... Now, I can get an electric shock on my hand. It's not a big deal. But obviously more sensitive parts of the body. This is something for which she was, in fact, arrested and charged with a crime, which was not dismissed for failing to state a charge. So for Amy Moore, this is a very strange situation. In the criminal court, this is a crime, what she said that she's done. Electrically shocking animals. But here, it's apparently, according to the defense, a largely no consequence. Did you say it was dismissed or it was not? She was acquitted. She was not dismissed on a pleading basis. She was acquitted after a trial. That's not in our record. Of course, you could take judicial notice of that. But again, even if you were to consider, while I'm rendering an opinion on what part of the dog's anatomy this was on, this is still tied into specific factual context. There are cases which found defamation saying, and these are cited in the brief, working a scam. The medical practice was a joke. That doctor was not, quote, any good as a doctor. Those sure sound like opinions, but given any factual context, that's defamation when it's false. This surely rises to that level, and I would say it's an easier case than those cases. And let me just emphasize that Mr. Keene specifically said committed the crime of animal cruelty, and subject to further questions, perhaps I can save the rest of my time for rebuttal. Thank you. Thank you. Thank you. Good morning, Your Honors. Good morning. May it please the Court. Good name. My name, again, Your Honors, is Mark Boyle, and I represent the defendants, Apolise, Diana Presnick, and John Keene. Can you raise your microphone? We're asking this Court to affirm the trial court's dismissal of this action. You represent three. I represent two. Diana Presnick and John Keene, the former Chicago police officer who made the arrest and wrote in a blog about his arrest. This Court should affirm the dismissal of this action with respect to the defamation per se and the false light actions. None of the statements that the plaintiffs allege were made and that are contained in the exhibits attached to the complaint, and those control, Your Honors. You must look at the language as contained in the exhibits and examine the specific statements of both of these individuals to determine if they rise to defamation per se, if they're verifiable facts, if they are non-actionable opinions, or, in Diana Presnick's case, capable of an innocent construction. And in our view, every one of those bases for dismissal is appropriate here. Diana Presnick simply saw, as Your Honors noted, an activity in a park where this dog trainer was apparently using a method where she attaches an electronic dog collar around the neck of a dog and another electronic dog collar, not a belt, around the rearmost waist of the animal. Now, did my client, it seems that there seems to be some contention on the plaintiff's part that there's nothing in the record suggesting another belt was on the dog around the rearmost area of the animal. That is flat out wrong. If you look at the record at page C95, which is the second page of the Chicago Reader article, I'm sorry, if you look at page 94, which is the first page of the Chicago Reader article, there is a witness identified in that instance, Heather Davis, who describes the Bichon Frise that Diana Presnick saw. She says she saw it wearing a collar around the neck and a collar around the rearmost area of the animal. That is entirely consistent with what Diana Presnick reported. And the record in this case, as far as the exhibits attached to this complaint, Your Honors, you have to assume that that's true. And if Heather Davis' statement is true, Diana Presnick's statement is true. There's also another statement in that record on the second page at C95. The second page of the Chicago Reader article identifies the state's attorney who told the reporter in the article that another witness, not Diana Presnick, intended to testify that that witness saw another dog with three collars on the animal, including one around the groin of the animal. The exhibits attached to this complaint that are established as true, because those allegations and those claims in the exhibit have not been identified as false by this plaintiff in her business. They are true. So for them to get up here and say, or in their brief, I mean, and say, well, there's nothing in the record that suggests that another collar was around the dog's rear area or waist is flat out wrong. With respect to John Keene, well, it's simply, let me go back to Diana Presnick. Diana Presnick's simple statement where she observed this training technique does not rise to the level of defamation per se. It does not impute a criminal activity, does not impute an inability in the plaintiff to conduct her dog training business. This could be the most effective training method ever designed. Okay. Now what about the arrest? Moving on to Keene. Well, John Keene is being sued simply for three statements. He, in his weblog, he noted that Pam Zeckman has done a story on the relevant part, Your Honor. Pam Zeckman has done a story on animal cruelty, I believe. Let me get the right language here. He says, this time, I'm sorry, again, Pam Zeckman has done a story that involves animal cruelty. This is his exact weblog statement. This time her story is about Amy Moore, a so-called dog trainer, whom I arrested and charged with cruelty to animals. Let's take that first statement. If you look at the transcript of Pam Zeckman's Channel 2 news piece, which is attached as an exhibit to the first amendment complaint, identified within that exhibit is the fact that dog trainers in Illinois are not certified. There is no agency that certifies dog trainers in that capacity. Therefore, I could get up and call myself a dog trainer, Your Honors could, anybody in this room could, because there is no certification for that title. John Keene, when he calls her a so-called dog trainer, is simply repeating Pam Zeckman's factual statement that there's no certification for dog trainers. Therefore, whether you're a dog trainer or a so-called dog trainer, that's true. There's no certification for it. The other aspect of that, calling someone a so-called dog trainer, that doesn't suggest anything defamatory about the person's ability to train dogs or a criminal behavior. That doesn't meet any of the criteria for defamation per se. It's also not necessarily verifiably false because, as I mentioned, there is no certification for dog training. And thirdly, it's simply an opinion. It's protected by the first amendment. So that alleged statement that gives rise to defamation is non-actionable on those three bases. The second statement, which is when John Keene wrote in his weblog that, I can tell you that Ms. Moore opened a training facility in the West Loop neighborhood and shortly after was seen by several area residents using what the residents felt were cruel techniques on various dogs. That's the second piece of the claim of defamation per se that the plaintiffs identify provides a basis for an action against John Keene. John Keene is simply saying that several residents in the area believed that her techniques were cruel. That is absolutely true. If you read the Chicago article or the Chicago Reader article, identified in that piece are residents in the area, not including Diana Presnick, who felt that the techniques that this trainer was using were cruel. That's a fact. That is not a factual statement that is actionable under the defamation per se case law that exists. Secondly, even if you assume that he said, I think those, or those techniques are cruel, even if he didn't couch it in terms of I think, what does that mean? My version of what is cruel would be, I'm sorry, any person's version of what is cruel would differ. I might think that putting a dog on a leash is cruel. Or someone else might think letting him free is the way to let him go. Is that cruel? There's no, and the case law requires this. There has to be a very precise and specific meaning to the words used by a defendant in a defamation case. In this case, there's no factual underpinning for what Officer Keene was calling a cruel technique. It's not identified in his web law. He doesn't say anything that would allow the court, or me, to deny the allegations and move on. I can't deny whether something's cruel or not. If that's the allegation, when I go to respond to that pleading, and that's why specificity is required, I don't know whether I deny it or not. What's cruel? Putting two collars on the dog, is that cruel? Shocking them with a light impulse, is that cruel? Cranking it up, is that cruel? At what level does the cruel word impose some factual specific element? That's why that claim fails. John Keene's, the action against John Keene for defamation per se, is simply too imprecise. It's based on basically an opinion. If you assume that he said the technique was cruel, that's his opinion. And it's non-actionable under the existing case law. So for those reasons, we had moved in the trial court, and it was granted for the dismissal of the action against John Keene. And I'm asking this court to affirm on the same basis, for all those reasons with respect to John Keene, that those are non-actual opinions, they're imprecise, and they're not verifiably false. None of the statements in his web law. Moving back to Diana O'Kresnik. This is a very frustrating situation, as your honors can imagine, because she was an eyewitness to a criminal proceeding. And she simply told Pam Zeckman and the reader what she saw. And if you read her specific statement, let's take the Chicago Reader first, at record site C94, which is the first page of that article. It says, Diana O'Kresnik, a friend of Davis', that's a reference to Heather Davis, who appeared in the article before, claiming that both collars were on this dog, says she saw Moore with the same dog that week. The Bichon was literally lifted into the air, that's how strong the shot was, O'Kresnik says. I'd never seen someone strap a collar around a dog's genitals before, and when I confronted her, she said something like, I'm just making sure this Bichon will never run into the street and get hit by a car. A live Bichon is better than a dead Bichon. It was so disturbing, I still can't get that sound out of my head. Now, with respect, the plaintiff seems to take particular offense at the use of the word genital. It's an imprecise word. It simply was Diane's identification of the area where the rearmost collar, which wraps around that rear hind area of a dog, would be located. She never said that the dog was being shot on its genitals, that's not in the record. That's not even in their First Amendment complaint as an allegation. And even if you assume that's what she said, it's still not actually. Because theoretically, that collar could have been in a position where, at some point during the course of the activity, in activating the impulses to the dog, the animal was experiencing some activity or impulse in the area of its genitals. I don't care if it's a female or male. And they raised that issue in the trial court. We responded in our response and told Judge Egan, look, it doesn't matter if this is a female or male. Because if the collar is around the rearmost area of the animal, it's so vague and imprecise as to whether it touches, comes in contact with, or is near some area of the genitals of the dog, whether they're internal, external, or some other area, that we can't have a lawsuit based on this statement. It's just not actual. It's not verifiably false. It's actually true because the collar runs underneath the animal and probably comes in contact with some area of its genitals. And therefore, it can't be untrue. Secondly, it could, even if it wasn't totally accurate as to where it would fall, it was her opinion. It's a non-actionable opinion. This case is just absolutely frustrating. It's terribly ridiculous. And I'm sitting here arguing in front of a panel of judges about the location of the collar on the dog and genitals. That's how silly this has become. However, I've got to move forward. Even if you assume or believe that this case actually pleads a defamation per se activity because it paints the plaintiff's profession in a bad light, let's pick that one, this statement about the location of the collar on the animal is capable of an innocent construction. It's reasonably capable of that. Certainly, when Diana Presnick, consistent with other people who are identified in the exhibits, sees this collar around the rearmost area of the dog, being unfamiliar with this training technique, she could reasonably assume that it goes around the area of the dog onto the genitals. And it would just be consistent with the plaintiff's training technique. And it could be a fantastic training technique. That would not mean that the plaintiff is a bad trainer. These residents may have felt that, but that's an opinion. But her statement that the collar went around the genitals of the dog is capable of an innocent construction. It's simply an observation of a training technique that Diana Presnick was completely unfamiliar with. Was it disturbing to her? Yes. Is that her opinion? Yeah. That's certainly not actionable. Mr. Schoenfeld says that. We're not suing her because she said it's disturbing or she was emotionally distraught about it. Because they would have had to name everybody else that was identified in the Chicago Reader. For those reasons, Your Honor, sorry, I just want to touch on one final thing. And that is that the plaintiffs on information and belief have claimed that some of the statements that PETA makes in its website should be attributed to Diana Presnick. And, number one, those statements are very similar to the statements that I've identified specifically that Diana Presnick put in the Chicago Reader, said to the Chicago Reader writer, and then to Pam Zeckman. So for all the same reasons, the information and belief allegations should be dismissed or affirmed, the dismissal of those allegations should be affirmed, the dismissal should be affirmed. Because they're all, you know, not verifiably true or false and they're not defamation per se. They're not actual opinions and they're capable of a reasonable construction. But also on information and belief, this defamation per se action and a false light action that is based on specific language must be pled with specificity. You have to put that language in the complaint. And that's what Green v. Rogers says. And although the plaintiffs claim that Green v. Rogers didn't come out until 2009, the pleading rules for fraud that Green v. Rogers rely on, obviously state that you have to give the court the opportunity to review the specific statements so the court can understand whether in the context that they're made, there is an action for defamation and false light. And the plaintiffs haven't done that. They also haven't pled how PETA would have come to the information through Diana Presnick. The article that's attached to the complaint suggests other people talked to PETA. There's no factual statement in those exhibits that Diana Presnick herself talked to PETA. There is a reference in the article, the reader article, that Diana Presnick and no individual that was interviewed for that article were members of PETA. So for all those reasons, the information and belief allegations trying to drag Diana into what PETA said should be dismissed. PETA also mentions in their internet posting that allegedly and reportedly these claims were identified. That should probably insulate PETA and that activity as well as Diana Presnick. And then, Your Honor, I don't think the court abused its discretion in denying the plaintiffs an opportunity to amend their complaint. They were claiming, again, as I mentioned, that they wanted to plead that the dog was a female. That doesn't make any difference in our view. It also didn't make any difference to the trial judge. And the trial judge was aware of we had made that argument in front of the trial judge at the motion to dismiss. Unless the court has any questions, I'll relinquish the rest of my time. Thank you. Thank you, Your Honor. Good morning again. Jim Besk, and I represent Mary DePaule. And I would start off that I adopt all of Mr. Boyle's arguments so I don't see the purpose of going through them again. So what I would like to do is go right to the statute of limitations, which applies to Mary DePaule. And on the face of the complaint, the only thing that's alleged against Mary DePaule in the defamation are the false light is this one PETA posting that happened on September 5, 2006. There's only one posting on the Internet. There's no dispute that Mary DePaule was not named until a year later, on March 27, 2009, which would be after the one year statute of limitations for both false light and defamation. So with that, on the face of the complaint, she should never have been named because the statute had expired. So that brings up two reasons. And the first reason is the idea that somehow the rules of putting it on the Internet are different than any other type of publication. And by that I mean it's in their pleadings. The only thing that's alleged is that it was put on the PETA website one time, one time only. So we challenge the whole purpose or premise that because it's on the Internet and it's only put there one time, somehow that's a republication because people can read it after it's published. The other premise that we challenge is that this is not Mary DePaule's website. This is PETA's website. And so they keep talking about things can be changed, things can be taken down. Mary DePaule can't do any of that to PETA's website. And I think the whole idea of this argument falls because of that. The other thing that I think has been alluded to, if we basically accept the plaintiff's argument that once you put it up on a website, then every day that it's up there it's a republication, in effect there would be no statute of limitations for defamation on the Internet. Any time that it's still up there, it could be up there forever. There would never be a statute of limitations. So then we would be carving out some specific rule for the Internet that wouldn't apply to a newspaper, for instance. And then the last thing is I still think the analogy that's already been brought up and that we brought up too, this is just like one article in one edition of the newspaper. That's all that happened. One posting of one article on the Internet. And just because you can pick up some newspaper and read it every day for the next 100 days, that doesn't mean that there's a new cause of action. And the same thing applies to this. So, in effect, if you accept this argument, I think the effect would be that you're eliminating any statute of limitations for the Internet.  The problem is that they have this vague allegation that Mary DiPaolo repeated this to people in the neighborhood within one year of the filing of the complaint. And I submit that under the case law, that's certainly not specific enough. And what's missing is, as we've indicated, the who, what, and when. Who did she repeat it to? What did she say? And when did she say? None of that is there about this one year within the statute. So I think primarily the Kalushi case that we cited, the same type of argument was made in that case in regard to the statute of limitations. And otherwise, you have to have a precise date of when the defamation was made or when the false light statement was made. And you've got to allege specific facts and not conclusions. So with that, I think for all the other reasons that Mr. Boyle indicated, we would be entitled to dismissal, but we have this separate ground on the statute of limitations. And I don't think there's any question on it. And in regard to the Second Amendment complaint, where they seek leave to file it, these deficiencies about when Mary DiPaolo said these things for the statute, nothing was changed in the proposed Second Amendment complaint. No request was ever made to supply these details. So that argument definitely would not apply to the Second Amendment complaint. So for these reasons, I request that the circuit court's decision be affirmed. And I think unless you have any further questions, I have nothing really to add. Thank you. Thank you. Counsel? I think it's important to try to briefly go through several points here. I think it's important to remember that the pleading rules for slander are much less stringent for very practical reasons than the pleading rules for libel because you're not in a position to quote things. And it's also important to remember that given that these were pleadings motions, you must assume that what we said, that the factual allegations we made are true, that Ms. DiPaolo and Ms. Lopresnik did make the statements we say they made, and that they were made when we say they made them. Now, this is not a matter of the statute with the Internet. This is not a matter of the statute of limitations never expiring. Each new publication is a new cause of action. You can sue for that within one year. The statute of limitations absolutely expires. That's a completely mischaracterized issue. The issue is whether or not this Internet situation with a website that is changed from time to time, not just left alone, constitutes a new publication or not. The answer to that question has to drive your decision. And it is a case of first impression in this state. What is not a case of first impression in this state, and what's been the law for over 100 years, is that when you say something defamatory, when I say something defamatory to somebody else, anticipating they can repeat it, I'm liable for their repeating it, for their republication. That's all that's going on here about statements made to PETA. And they knew PETA wasn't going to keep this quiet. That's not what PETA does. And when we say that they were made within one year, you have to assume for present purposes that's correct. It's not like this went to trial. This is on motions to dismiss. To go back to the other defendants, let me make something clear. I was not saying that there was not a second cover. I was saying that nothing that Amy Moore actually said in the record says there was. I don't think we're responsible for saying everything in the newspaper article is true. Obviously it's not. We're claiming the specific statements that are the basis of the case in the newspaper article are false. We certainly didn't have to go through every other statement in the article and specify whether they were true or false. That's all that I meant earlier. The point is that Ms. O'Kresnik did not say the waste. She did not say around the pine quarters. She said the genitals. There are different anatomical parts which are significantly different, which get different reactions when people hear about them. Let me just use one example. Spanking a child on the pine quarters is still considered acceptable in our society. Striking a child on the genitals as a matter of discipline is obviously not and would land you in jail. It makes a huge difference. Genitals are not the waste. We don't have to be experts to know that one. The Green case, which was mentioned briefly and which was discussed in the brief, was decided after this was dismissed, so we could hardly comply with a new pleading rule that hadn't been set forth yet, unless you remand it and tell us to amend. As to going back to Mr. King for a moment, I'm not sure the right statement was read, but there were a number of statements, but let me focus on just one of them. Furthermore, these citizens were getting so frustrated by the continued acts of cruelty, they had to witness that they even talked about pooling their money to hire a private investigator to file a misdemeanor and collect evidence. We didn't sue because of the clause the citizens were getting frustrated. He can say that. We didn't sue because he said they were thinking of pooling their money to get a private investigator. He can say that. We sued because he said continued acts of cruelty, flat out saying that she was guilty on multiple occasions of a crime. In the context of he arrested her for that crime, having personally decided there was probable cause. Now, if that isn't a context which says that she committed a crime, which is per se defamation, then I really don't know what could be. You can't say somebody committed a crime, falsely say it, in an unprivileged situation. We didn't sue him for making the arrest. We didn't sue him for anything connected with the criminal prosecution. We sued him for getting on the internet and saying she's guilty. You can't do that when that's false. You shouldn't be allowed to do it when it's false. Counsel said this is ridiculous to him. Well, it wasn't ridiculous to Amy Moore when all this got said about her and she winds up having to defend herself in a criminal court and having people think that she's electronically shocking dogs' genitals. It wasn't ridiculous to her, to be honest. I would ask you to reverse and remand. Thank you. Unless there are further questions. Thank you. The matter will be taken under advisement.